548 S.E.2d 137 (2001)
249 Ga. App. 435
In the Interest of M.L.C., a child.
No. A01A0311.
Court of Appeals of Georgia.
April 30, 2001.
*138 Farkas & Ledford, Leonard Farkas, Albany, for appellant.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Asst. Atty. Gen., Simpson & Cross, Melanie B. Cross, Tifton, for appellee.
RUFFIN, Judge.
The father of M.L.C. appeals the juvenile court's order finding the child deprived and awarding temporary custody to the Georgia Department of Human Resources, acting through the Worth County Department of Family & Children Services ("DFACS"). Because we agree with the father that there is insufficient evidence supporting the juvenile court's order, we reverse.
1. As a threshold matter, the father asserts that the juvenile court's order should be vacated because it failed to recite sufficient facts necessary to confer personal and subject matter jurisdiction upon the court. We disagree.
In support of his assertion, the father relies on the general rule that "a juvenile court is a court of special and limited jurisdiction, and its judgments must show on their face such facts as are necessary to give it jurisdiction of the person and subject matter."[1]
In this case, the court's order reflects on its face that it was addressing the alleged deprivation of M.L.C., and juvenile courts clearly have subject matter jurisdiction over deprivation petitions.[2] As for personal jurisdiction, this is an issue that can be waived, and because the father has not shown that he raised the matter below, we deem it waived on appeal.[3]
2. We do agree with the father, however, that there is insufficient evidence supporting the juvenile court's conclusion that M.L.C. is deprived. Under Georgia law, a child is deprived if the child "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."[4] On appeal from a juvenile court's order finding deprivation, we review the evidence "in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the (child was) deprived."[5] The "clear and convincing" standard should not be discounted.
This standard of review safeguards the high value society places on the integrity of the family unit and helps eliminate the risk that a fact-finder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior. Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.[6]
*139 In this case, DFACS contended that M.L.C. was deprived because of alleged "substance abuse problem[s] suffered by [the mother and father] ... which fuel domestic violence." The evidence presented at the deprivation hearing established that the mother has a history of abusing prescribed medications. In fact, DFACS first became involved with M.L.C.'s family in August 1999, when police found the mother on a roadside, "apparently incoherent" from some form of drug. In October 1999, the mother and father were involved in an automobile accident. The mother broke numerous bones and was prescribed medication for her pain. The mother admitted to a family therapist that she "had a problem with prescription pain killers," and her physician drastically reduced the amount of prescribed medication after learning that she was abusing the medication. The mother further acknowledged in court that she had been hospitalized once for her drug use and four times for depression, the last time being around 1997.
Evidence of the father's drug use showed that he was 42 years old at the time of the hearing, and he admitted that he started smoking marijuana when he was 16, but claimed that he had now quit. DFACS first became concerned about the father's drug use following the August 1999 incident when police found the mother incoherent on the roadside. At the time, the mother and father were separated, and the mother informed DFACS that she was worried about M.L.C. being with her father because he used cocaine and marijuana. Based on the mother's allegation, DFACS established a safety plan for M.L.C. that placed the child with another family until the father could be tested for drug use. The father agreed to the plan, and after he tested negative for drugs, DFACS returned M.L.C. to him. As part of the safety plan, the father agreed to continue being tested for drug use. From August 1999 until February 2000, the father was screened for drug use at least once per month, and each time the results were negative. In March 2000, however, the father tested positive for using marijuana. From that point until the deprivation hearing in July 2000, the drug screens yielded negative results.
In addition, the evidence showed that the father, who is disabled due to a degenerative bone disease, takes large quantities of prescription pain medication for his condition. And, as a consequence of the October 1999 automobile accident, the father broke three bones in his neck, and his physician prescribed additional medication.
There is little evidence of record indicating how the parents' drug use affected M.L.C. A therapist testified that M.L.C. told him that "she would like to see her father stop taking drugs and her mother stop taking so many pills." The father acknowledged that he had talked to M.L.C. about marijuana, informing her that he had used it and that it was "a bad habit and it was not something that [he] wanted her to do." The father further testified that he had never used marijuana around M.L.C. According to the father, when he told M.L.C. that he failed the drug test in March 2000, "it hurt her feelings."
Evidence of domestic violence revealed that on March 15, 2000, the mother and father had a violent altercation in the family's home. That morning, after M.L.C. left for school, the mother told the father she was leaving him, and he responded that if she left, he was going to sell her wedding band to "catch the house payments up." When the mother started "raking everything off the dressers and turning over stuff," the father attempted to call a DFACS caseworker. Because the mother repeatedly tried to take the phone away from him, the father grabbed "her by the arm trying to hold her back," apparently leaving "marks" on her arm. The caseworker testified that she received a message on her telephone answering machine indicating that the mother and father were having a violent verbal altercation and that another caseworker who went to the house found "marks" on the mother's arm. Based on this incident, the juvenile court found that M.L.C. was in "imminent risk," and DFACS removed the child from the home that day.
The only other evidence of family violence showed that at some point in the past the father had called the police after the mother threw a glass of tea in his face. The father *140 also testified that they have "had about three [fights] in these last 15 years."
Finally, the evidence showed that at the time of the deprivation hearing, M.L.C. was ten years old and in the fifth grade. The mother testified that M.L.C. had been on the honor role at school since kindergarten, that she missed school only when she was sick, and that she never had any discipline problems at school. M.L.C. stated that she wanted her mother to get her life together and stop taking so many pills and that she wanted her father to tell the truth, "like that drug test where he said he didn't use any but he did."
A neighbor, whose child played with M.L.C. before M.L.C. was removed from the family home, testified that the mother and father are "great parents." Likewise, a former neighbor who also had a child that played with M.L.C. testified that the mother and father were "wonderful" parents and that she was unaware of any domestic violence in the home.
Based on this evidence, the juvenile court found that M.L.C. was deprived. Several of the court's factual findings appear to be without support in the record and need to be addressed. The court found that the March 2000 altercation between the mother and father "started when [M.L.C.] was present in the home, but concluded after [M.L.C.] left for school." The evidence does not support this finding. Instead, the evidence clearly shows that although the mother was upset with the father during the morning hours before M.L.C. went to school, they did not begin fighting until after M.L.C. left the house. There is no evidence that M.L.C. was present during this or any other altercation between the mother and father. Second, the court found that the father "admitted he smokes [marijuana] on a regular basis." Although the father admitted that he previously smoked marijuana, at the hearing he testified that he had smoked marijuana only once in the preceding ten months, and the evidence showed that he was tested at least monthly from August 1999 until July 2000 and failed only one of these tests. Finally, the court found in its order that the "father has a problem with abuse of prescription drugs." The judge's comments at trial reflected a similar concern:
I don't care whether you got them from the doctor or whether you got them from your friendly drug salesman down the street. That child sees folks abusing drugs. And I'm sorry for your medical condition, but I'm going to see how much you want to change. I'm going to give the Department custody. You say you want to get her back.... You're going to have to give up those drugs.
Though it cannot be disputed that the father takes large quantities of prescription pain medication, there is no evidence that he abuses that medication, and we are troubled that the juvenile court so quickly dismissed the fact that these medications were prescribed by the father's physician for what is obviously a painful and debilitating condition. Moreover, there was no evidence that the father's use of this medication rendered him unfit to provide for the needs of M.L.C.[7]
Although we do not condone the mother's abuse of prescription drugs or the father's use of marijuana, the evidence does not clearly and convincingly establish that M.L.C. is deprived. Rather, it is uncontroverted that the parents, despite their problems, have taken care of M.L.C. The most that can be said is that M.L.C., like the juvenile court judge, wishes her mother would stop abusing prescription drugs and that her father would tell the truth about using marijuana. Evidence showing that M.L.C. is a good student and a well-adjusted child who recognizes the pitfalls of drug use attests to the fact that her basic physical, mental, and emotional needs have been met.[8] Furthermore, although the parents have had three relatively violent confrontations in fifteen years, there is no evidence that M.L.C. was present during the altercations or that she was otherwise affected by them. Under these circumstances, the trial court erred in *141 finding M.L.C. deprived and in awarding temporary custody to DFACS.
Judgment reversed.
JOHNSON, P.J., and ELLINGTON, J., concur.
NOTES
[1] (Punctuation omitted.) In the Interest of S.K.L., 199 Ga.App. 731, 734(2)(c), 405 S.E.2d 903 (1991).
[2] See OCGA § 15-11-28(a)(1)(C).
[3] See S.K.L., supra at 734(2)(b), 405 S.E.2d 903.
[4] OCGA § 15-11-2(8)(A).
[5] In the Interest of B.M.B., 241 Ga.App. 609, 527 S.E.2d 250 (1999).
[6] In the Interest of C.D.E., 248 Ga.App. 756, 761(1), 546 S.E.2d 837 (2001).
[7] See Id.
[8] See In the Interest of D.E.K., 236 Ga.App. 574, 577-578, 512 S.E.2d 690 (1999).