560 S.E.2d 69 (2002)
253 Ga. App. 565
In the Interest of G.G. et al., children.
No. A01A2409.
Court of Appeals of Georgia.
February 1, 2002.
Turner & Willis, Christopher W. Willis, Gainesville, Lynn Akeley-Alderman, Dahlonega, for appellant.
*70 Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Laura W. Hyman, Asst. Attys. Gen., Thompson, Fox, Chandler, Homans & Hicks, Catherine H. Hicks, Gainesville, Hall & Rapoport, Robert E. Hall, Atlanta, for appellee.
MIKELL, Judge.
J.G., the biological mother of G.G. and B.A.S., eighteen months and five months, respectively,[1] appeals the juvenile court's order finding the children deprived and awarding temporary custody to the Lumpkin County Department of Family & Children Services ("DFCS"). We affirm.
"On appeal from a juvenile court's order finding deprivation, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the [children were] deprived."[2] We neither weigh evidence nor determine the credibility of witnesses.[3]
So viewed, the evidence shows that on March 1, 2001, J.G. left G.G. in the care of her boyfriend's sister while she went to work. Her boyfriend, B.S., who is B.A.S.'s father, came home at about 5:30. B.S. testified that he wrestled with G.G. that evening as he did every evening when he arrived from work. He and G.G. picked up J.G. at about 11:00 p.m. J.G. recalled that G.G. whined throughout the night while sleeping.
The next morning, J.G. noticed that G.G. was holding his right arm. When she asked B.S. if G.G. had fallen, he told her that they had wrestled the previous night and that G.G. had cried several times while they were wrestling, but he had not noticed that anything was wrong with G.G. Later that day, J.G. noticed that G.G.'s arm was swollen, but she still did not become alarmed because G.G. played on the floor as he normally did. J.G. testified that G.G. dropped his cup later that evening because he could not hold it in his right hand and that B.S. threw it against the wall and started calling G.G. vulgar names. J.G. confronted B.S., they argued, and J.G. called a shelter and left with the children. When they arrived at the shelter, J.G. asked if someone would take them to a doctor. The doctor examined G.G.'s arm but did not take x-rays. They returned to the shelter, and G.G. cried and held his arm throughout the night.
The next morning, after she had scheduled another doctor's appointment for 2:00 p.m., J.G. was told that DFCS had called and planned to visit the shelter within an hour or so to talk to her about G.G.'s arm. When the DFCS caseworker arrived, J.G. explained that she did not know what happened to G.G.'s arm. The caseworker insisted that she take the child in for x-rays immediately. The x-rays showed that G.G.'s right arm had been fractured in two places.
The juvenile court ordered that the children be placed in the custody of DFCS for emergency shelter care on March 8, 2001. On April 4, 2001, Lumpkin County DFCS filed its petition for temporary custody of the children. At the deprivation hearing, DFCS introduced a report from Dr. Kris Sperry, Chief Medical Examiner for the State of Georgia, who reviewed G.G.'s medical records and x-rays. Dr. Sperry concluded that the fractures resulted from an adult exerting a severe, twisting force upon G.G.'s arm, hand, and wrist in a violent, forceful manner, which constituted child abuse. Dr. John Hemmer, who examined G.G. on March 6, 2001, testified that he also observed two fractures of G.G.'s right arm and that from the pattern of the injuries, it was unlikely that they were accidentally caused. Also, it would have been unusual for the injuries to have occurred simultaneously. Dr. Hemmer opined that one of the breaks was caused by a fall or a direct blow while the other, which was unusual in a child of G.G.'s age, was caused by a twisting mechanism. He testified *71 that the latter injury was consistent with a child's arm having been twisted by an adult. When asked if G.G.'s injuries were consistent with child abuse, Dr. Hemmer replied, "I would certainly think about that more, yes."
DFCS offered evidence from B.S. that J.G. regularly picked up G.G. by one arm. Mickey Kane, who is B.S.'s brother's girlfriend and lived with J.G. and B.S. for two to three months, also testified that she saw J.G. pick up G.G. by one arm. J.G. denied that she ever picked up her child by one arm and maintained that she did not know how G.G.'s injury occurred. Dr. Hemmer testified, however, that J.G. told him that B.S. broke G.G.'s arm while she was at work.
The record revealed that J.G. and her children had a long history with DFCS. DFCS presented evidence of other injuries suffered by G.G. since his birth and of J.G.'s case history. On cross-examination, J.G. testified that when G.G. was two months old, his doctor prescribed a home cardiac/apnea machine to monitor his breathing problems. The Apnea Center at Children's Healthcare of Atlanta was asked to download findings from the monitor to interpret and to report them to G.G.'s doctor. J.G. testified that the doctor told her to use the monitor for two weeks, and if G.G. did not appear to have problems breathing, she could discontinue its use. To refute J.G.'s testimony, DFCS introduced a letter to J.G. from Children's Healthcare of Atlanta informing her that they planned to discontinue their services on June 26, 2000, because she was unwilling to use or download the monitor. J.G. denied that she had ever received the letter.
Debra Bryeen, a White County DFCS caseworker, testified that she investigated J.G. for general neglect of her home and of G.G. in August 2000. Bryeen testified that at that time, J.G. lived with her mother, stepfather, and two siblings in a two-bedroom trailer. When she visited J.G. in the trailer, Bryeen observed roaches all over the home, piles of clothing on the floor, flooring that had fallen out under the sink, trash, cigarette burns, and holes in the walls. She smelled an odor from garbage, feces, and urine. At that time, J.G. was seven months pregnant with B.A.S. Bryeen testified that she and J.G. had several heated discussions about the condition of the home and that they finally agreed that J.G.'s sister would move in to help clean the house.
In September 2000, another caseworker from White County DFCS visited J.G. to investigate the allegation that G.G.'s legs were infected. G.G. had casts on both of his legs after having surgery for his club feet. J.G. testified that G.G.'s legs became infected because of eczema. On the morning of September 15, 2000, J.G. and G.G. visited Bryeen at DFCS. When Bryeen saw G.G., she was concerned that he had impetigo and urged J.G. to take him to a doctor. Because J.G. insisted that she would wait to take him later than evening, she and Bryeen argued, and Bryeen had a co-worker call the police after J.G. threatened her. Bryeen testified that they eventually went to the doctor, and after he diagnosed impetigo, J.G. argued with the doctor about his prescribed course of treatment for G.G. Bryeen then referred J.G. to counseling for parenting classes and counseling with her anger.
Three weeks after G.G.'s bout with impetigo, he fell from the seat of B.S.'s truck and hit his head on the pavement. J.G. testified that she was cleaning G.G.'s carseat because he had vomited and that she had asked B.S. to sit with G.G. in the truck. Instead, B.S. left the child alone in the truck and closed the door. When he opened it, G.G. fell, hitting his head on the pavement. When questioned about her statement to hospital personnel that the accident happened because G.G. rolled over while J.G. changed his diaper, J.G. replied that the records were inaccurate.
Licensed clinical social worker Kristen Snedden testified that she provided counseling to J.G. When Snedden first visited J.G. at her mother's trailer on September 29, 2000, Snedden observed and commented upon the unsanitary living conditions. These conditions had not changed by Snedden's second visit. When Snedden next visited on October 9, 2000, she learned from J.G.'s mother that J.G. had moved to Lumpkin County to live with her boyfriend. J.G.'s mother reported that they had had a fight and that J.G. had been verbally and physically abusive and *72 could no longer live there. Snedden then advised the White County DFCS caseworker that J.G. had left the county. Snedden closed her file on J.G. on November 28, 2000, reporting that J.G.'s prognosis was poor and that she would continue to need intervention to insure the safety and well-being of her children.
Snedden's next contact with J.G. occurred in April 2001 after G.G.'s arm was fractured, when DFCS requested that the social worker assess the children. In her assessment, Snedden found that G.G. was developmentally delayed. He had very low activity for his age. He was not able to say more than three words, while other eighteen-month-old children have vocabularies of at least twenty to thirty words. He was not walking yet. His ability to show affection was stunted in comparison to other children his age. Because of G.G.'s problems, Snedden recommended a structured child care environment for him so that G.G. could interact with other children and adults. J.G. testified that she thought Snedden's recommendations were wrong and that she planned to have her sister keep both of her children if they were returned to her.
Snedden testified that the five-month-old child, B.A.S., needed continued treatment for reflux and ongoing monitoring, especially in light of his history with asthma. Also, she testified that B.A.S. should remain on the feeding schedule recommended by his doctor because of his reflux problems. Snedden recommended the continuation of both children's current foster care placement.
On June 4, 2001, the juvenile court entered an order finding the children deprived and awarding DFCS temporary custody, which J.G. appeals. In her sole enumeration of error, J.G. argues that the juvenile court erred in finding that DFCS carried its burden of presenting clear and convincing evidence of deprivation. We disagree.
OCGA § 15-11-2(8) defines a deprived child as one who:
(A) [i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals; (B) has been placed for care or adoption in violation of law; (C) [h]as been abandoned by his or her parents or other legal custodian; or (D) [i]s without a parent, guardian, or custodian.
In its order, the juvenile court found that the children were without proper parental supervision and care and had no parent or guardian to care for them. DFCS offered uncontroverted and unrebutted testimony from Drs. Sperry and Hemmer that G.G. was subjected to child abuse, resulting in two fractures to his right arm. The court concluded from the evidence that G.G. was injured either by the neglect of the parents or by child abuse, and that the medical evidence supported a finding of child abuse.
We have previously affirmed deprivation orders where the cause of the child's injuries was never determined.[4] In In the Interest of J.V.,[5] which is factually similar to this case, we held that "[d]eprivation may be shown to have resulted from parental unfitness that is either intentional or unintentional misconduct resulting in the abuse or neglect of a child by what is tantamount to physical or mental incapability to care for the child."[6] Our holding mandates that we reject J.G.'s argument that the trial court erred by applying the doctrine of res ipsa loquitur because there was no substantive evidence that she or B.S. intentionally or unintentionally harmed G.G.
In In the Interest of J.V., the child's x-rays revealed 13 fractures in his extremities and there was no evidence as to how the fractures occurred.[7] Two expert witnesses testified that there was no plausible explanation other than child abuse, while another expert testified that the injuries could have resulted from child abuse or accidental injury. The child was in the care of the parents or grandmother when the fractures occurred. Each *73 caretaker denied abusing the child, and none offered evidence that he or she would do anything differently if the child were returned to the home. We affirmed the juvenile court's finding of deprivation as it was supported by clear and convincing evidence.
Here, Dr. Sperry opined that the cause of G.G.'s fractures was definitely child abuse, and Dr. Hemmer testified that the cause was probably child abuse. The evidence shows that G.G. was in the care of J.G., B.S., or B.S.'s sister when the fractures occurred. There was no explanation offered by J.G. as to how the fractures occurred, only J.G.'s denial that they could have been caused by her picking up the child by one arm and B.S.'s denial that it occurred when he was wrestling with G.G. There was no evidence that J.G. intended to comply with the recommendations of the social worker as to the best future care for her children. In fact, there was evidence to the contrary. Thus, here, as in In the Interest of J.V., the fact that there was no determination as to how the injuries occurred is inapposite.
The juvenile court also found that there was a history of uncontrolled anger by both parents toward each other, which created a dangerous environment for the children, and that DFCS made reasonable efforts to avoid court intervention. J.G. argues that neither of these findings is supported by clear and convincing evidence. Pretermitting whether they are so supported, the evidence presented was nonetheless sufficient to support the deprivation finding, which authorized the award of temporary custody.[8] J.G. also contends that there was no clear and convincing evidence presented that the deprivation was ongoing. We disagree and find that there was ample evidence to support the court's conclusion that remaining in the parents' home would be contrary to the children's welfare and that the children needed its protection while the parents endeavored to comply with the reunification plan.
Accordingly, having reviewed the evidence in the light most favorable to the juvenile court's judgment, we affirm the juvenile court's order.[9]
Judgment affirmed.
BLACKBURN, C.J., and POPE, P.J., concur.
NOTES
[1] These were the children's ages at the time of the hearing in May 2001.
[2] (Punctuation and footnote omitted.) In the Interest of M.L.C., 249 Ga.App. 435, 436(2), 548 S.E.2d 137 (2001).
[3] In the Interest of C.C., 249 Ga.App. 101, 547 S.E.2d 738 (2001).
[4] Rodgers v. Dept. of Human Resources, 157 Ga.App. 235, 276 S.E.2d 902 (1981); see also In the Interest of J.V., 241 Ga.App. 621, 526 S.E.2d 386 (1999).
[5] Supra.
[6] (Citation omitted.) Id. at 626, 526 S.E.2d 386.
[7] Id.
[8] See OCGA § 15-11-55(2)(B).
[9] In the Interest of M.L.C., supra.