A05A0712. IN THE INTEREST OF H. E. et al., children.
(612 SE2d 909)

ELLINGTON, Judge.

In July 2004, the Juvenile Court of Morgan County determined that one-year-old H. E. and his half-sister, ten-year-old M. F., were deprived. Pursuant to this finding, the court placed the children in the temporary custody of the Morgan County Department of Family

---

and Children Services. The children's mother appeals from the court's order, contending there was insufficient clear and convincing evidence to support a finding that the children were deprived. Finding no error, we affirm.

Under OCGA § 15-11-2 (8) (A), a child is deprived when he or she is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."

> On appeal from a juvenile court's order finding deprivation, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the children were deprived. We neither weigh evidence nor determine the credibility of witnesses.

(Punctuation and footnotes omitted.) *In the Interest of G. G.*, 253 Ga. App. 565 (560 SE2d 69) (2002).

So viewed, the record shows that the children's mother has a long history of illegal drug use, alcohol abuse, chronic financial instability, and volatile relationships with abusive men. The mother began using illegal drugs, including intravenous drugs, as a teenager. Over the next several years, she was able to maintain brief periods of sobriety, which ended when she was around others who were using drugs. She drifted between the homes of family members, friends, boyfriends, and fellow drug abusers, and she was sometimes homeless. In addition to the two children at issue in this case, the mother had two other children, one who was raised by a family member and another who was surrendered for adoption.[1] Because of the mother's transient lifestyle and unrehabilitated drug abuse, DFCS offices in seven different Georgia counties have worked with the mother since 1995 to help her address her personal problems and develop parenting skills. According to a DFCS caseworker,[2] the agency's assistance helped the mother make temporary changes in her behavior, but she repeatedly relapsed back to an unstable lifestyle that was dangerous to her and her children.

M. F. was born in January 1994 and was ten years old at the time

---

[1] The child who had been given up for adoption had been born premature and addicted to methadone during a period in which the mother was homeless, addicted to drugs, and incarcerated. The mother surrendered her rights to the child after DFCS recommended termination of her parental rights.

[2] The hearing transcripts contain the testimony of several DFCS employees from different counties and working in various capacities, including case management, protective services, social services, and placement management. In order to simplify this complex case, we will refer to these employees as "caseworkers."

of the deprivation hearings.[3] In June 1995, a Rockdale County court removed M. F. from her mother's custody and placed the child with her paternal grandparents in Florida. The mother regained custody of the child a few months later, and she and M. F. moved repeatedly before the mother sent the child back to Florida to live with the grandparents in 1998. M. F. lived in Florida from 1998 until 2003, during which time M. F. was very close to her grandparents, a good student with perfect school attendance, and active in extra-curricular activities. The mother visited her only three or four times, provided no clothes or other necessities, and paid no child support. In July 2003, the mother visited M. F. in Florida and, after telling the grandparents she was taking the child to dinner, instead brought the child to Georgia. The mother claimed she took the child away from the grandparents because she was concerned that M. F.'s father, who was a drug abuser, sometimes lived in the grandparents' home and the child had seen drugs in the father's car.

From July through November 2003, M. F. lived in Georgia with her mother, M. F.'s infant half-brother, H. E., and the infant's father. On November 10, 2003, the Morgan County DFCS received a report that the mother's 16-year-old brother, who had a history of juvenile delinquency and drug abuse, was also living in the home. A DFCS caseworker visited the home because, given the mother's long history of drug abuse, the agency did not believe it was in the best interests of the mother and her children to have the brother living in the home and using drugs. During the same home visit, the DFCS caseworker also learned that the mother had invited M. F.'s father to come to Georgia and that he was living in the home. The mother gave three different explanations for why M. F.'s father was living there. The DFCS caseworker told the mother that M. F.'s father would have to leave, and the mother signed a safety plan in which she agreed that M. F.'s father would not live in the home or visit for more than two hours at a time.[4]

Two days later, however, the mother and M. F.'s father drove to the Atlanta area in order to buy narcotics. They purchased Xanax, Lortab, and methadone, and used the drugs before the mother drove home. H. E. and a friend's small child were in the car during the trip. When H. E.'s father learned of this incident, he threatened M. F.'s father by holding a knife to the man's throat. M. F. was present in the

---

[3] The deprivation hearing was started in January 2004, but, due to a series of continuances, was not completed until June 15, 2004.

[4] According to a DFCS caseworker, the mother obtained a court order from another county that allowed her brother to stay in her home.

home at the time and was "cowering and crying" during the confrontation. Later that evening, the mother and M. F.'s father walked to a nearby motel and smoked crack cocaine.

Then, at approximately 3:30 a.m. on November 24, the mother was arrested for DUI after failing field sobriety tests; a 17-year-old friend of her brother's (hereinafter referred to as the "teenager") was in the car at the time. The mother refused to submit to a blood alcohol test. The next morning, H. E.'s father found the mother sleeping in a bed with her brother and the teenager. The mother called 911 from a neighbor's house after she and H. E.'s father had an argument and he had "snatched" her out of bed. Police officers arrived and H. E.'s father left the home. About an hour and a half later, the mother was on the telephone with a domestic violence crisis center when H. E.'s father returned and cut the phone lines to the home. The crisis center contacted the police, who went back to the home. H. E.'s father had left again, but was arrested later for cutting the phone line.

According to police officers and DFCS caseworkers who responded to the 911 calls, M. F., H. E., the mother's brother, and a neighbor's three-year-old child were present in the home that day. The house was in disarray, dirty clothes were scattered on the floor, and old food and dirty dishes were piled up in the kitchen. The infant, H. E., was filthy and wearing only a dirty diaper while crawling around on the floor. The mother was laying on the sofa, and M. F., who was nine years old at the time, appeared to be taking care of the baby. Further, while walking through the house, a DFCS caseworker noticed that someone, later identified as the teenager, was hiding in the attic. The caseworker testified that the teenager was "glassy-eyed" and "thick-tongued" and was obviously under the influence of an intoxicant. The teenager told the caseworker that he was hiding in the attic because he was afraid of H. E.'s father.[5]

A DFCS caseworker asked the mother to sign a safety plan that allowed the agency to place the children with their respective grandparents and required the mother to get drug and alcohol rehabilitation. The mother refused to sign the plan or to be screened for drugs.[6] According to the caseworker, however, the mother verbally agreed to allow the children to be placed with their grandparents, and the agency did so. On December 5, 2003, the juvenile court issued a shelter care order granting DFCS custody of H. E. and M. F.

---

[5] The record also shows that the mother showed up at the home of the teenager's father at 1:00 a.m. the next morning, pretending to be a psychologist and asking to see the teenager. The teenager eventually left with the mother. Two days later, police officers were called to the mother's home during a suicide attempt by the teenager and the mother's brother.

[6] The mother has since refused all requests for drug screens.

The record also shows that a psychologist who examined M. F. found that the child exhibited sexual knowledge that was unusual for her age and that it could indicate she was exposed to a "sexualized environment," pornography,[7] or sexual abuse. The psychologist also testified that M. F. exhibited Reactive Attachment Disorder as a result of being frequently "uprooted" and exposed to a transient and chaotic lifestyle. He testified that M. F. had difficulty forming relationships with her peers and had become "parentified," meaning she had grown up too fast and had been given responsibilities that were beyond her developmental level, such as caring for H. E. The psychologist also opined that M. F. needed a stable environment where she could feel safe and that she would need long-term psychological treatment to address her relationship issues.

Finally, the record contains a report from a psychologist who evaluated the mother and diagnosed her as suffering from Poly-Substance Dependence, alcohol abuse, depression, and a personality disorder. He opined that the mother needed long-term therapy, drug treatment, random drug screens, extensive parenting training, possible psychiatric treatment, and other assistance.

After considering the evidence, the juvenile court found that the children were deprived and that the mother had caused such deprivation by neglecting the children, failing to provide adequate housing, abusing alcohol and drugs, failing to protect the children from domestic violence, and becoming estranged from M. F. during the five years the child lived in Florida. The court ruled that the mother needed to accomplish the psychologist's recommendations before the children could be returned to her care. The court also found that M. F.'s father had caused M. F. to be deprived by exposing her to pornography and due to his substance abuse.[8] In contrast, the court found that H. E.'s father had not caused the infant to be deprived, but ruled that the infant could not live with the father until he lived separately from the mother or she completed a reunification plan. The court concluded that it was in the children's best interests that they be placed in the temporary custody of DFCS until the mother completed a reunification plan.

We find the juvenile court's order is supported by the record. Although the mother attempted to explain away many of DFCS's allegations during a December 2003 emergency shelter care hearing, it is up to the juvenile court to determine the credibility of the witnesses and the weight of their testimony, and we will not second

---

[7] There was evidence that M. F. used a computer at her mother's home on which someone had downloaded pornographic materials, including 6,000 images of child pornography.

[8] M. F.'s father did not participate in this appeal.

guess the court's conclusions on contested factual issues. *In the Interest of G. G.*, 253 Ga. App. at 565. Further, the mother's argument that the events leading to the instant deprivation petition represented a "one-time incident" during which she simply "fell off the wagon" lacks any merit. Even though there was some evidence that the mother has experienced brief periods of relative stability as an adult, the record shows that she has been unable to maintain such stability, particularly when she is involved with abusive men or those with substance abuse problems. The court may consider the past conduct of the mother in making its determination that the deprivation of the children would continue if the children were left in the mother's care. *In the Interest of D. T.*, 251 Ga. App. 839, 846 (3) (555 SE2d 215) (2001). "Such an inference is appropriate, since the juvenile court is not required to reunite [H. E. and M. F.] with [their mother] in order to obtain current evidence of deprivation or neglect." (Citation and punctuation omitted.) Id. The juvenile court's decision as to the children's safety and their future welfare must rest on more than positive promises which are contrary to negative past fact. *In the Interest of C. D. A.*, 238 Ga. App. 400, 403 (1) (519 SE2d 31) (1999). Therefore, we find there is ample clear and convincing evidence to support a conclusion that the children were deprived when they were removed from the mother's home, that remaining in the mother's care would have been contrary to the children's welfare, and that the children need protection while the mother endeavors to comply with a reunification plan. *In the Interest of G. G.*, 253 Ga. App. at 570.

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

DECIDED MARCH 30, 2005.

*Winkler, DuBose & Davis, Brad J. Evans*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General*, for appellee.