## A08A1759. In the Interest of N. H., a child.

(674 SE2d 126)

ADAMS, Judge.

The teenage mother of N. H. appeals the juvenile court's finding that the child is deprived. The finding was largely based on facts showing that the mother had fed the baby inappropriate food. The mother enumerates three errors including that the evidence was insufficient to support the finding. We affirm.

1. "On appeal from a juvenile court's order finding deprivation, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the [child was] deprived." (Citation and punctuation omitted.) *In the Interest of G. G.*, 253 Ga. App. 565 (560 SE2d 69) (2002).

The child was born on April 6, 2007. Construed in favor of the judgment, the facts show that the 17-year-old mother only knows the father's first name and she does not know his whereabouts. The mother and child live with the maternal grandmother, the mother's brother, her 17-year-old sister, and the sister's infant child.[1] Ebretta Carpenter of the Department of Family and Children Services (DFACS) began to assist the family shortly after the child was born. Some issues had arisen at the hospital, including the mother having temper tantrums and appearing unable to care for the child. DFACS implemented diversion services as a result of these concerns and concerns about the mother's young age. At one point Carpenter vaguely referred to the mother's alleged mental limitations: she stated that she "did not observe[,] I guessed to her limitations." All Carpenter knew personally was that the mother had dropped out of school.

Based on her four monthly visits, Carpenter concluded that the mother loved the child, that the home was maintained suitably for raising young children, and that the child always was appropriately dressed. Carpenter never observed any abuse or neglect, she had no personal knowledge of inappropriate behavior toward the child, and she felt that the child was in a safe environment. The mother, however, also told Carpenter that the child did not have a primary care physician.[2]

On a visit in July, Carpenter learned from the grandmother that the family did not have any formula and was feeding the child whole milk; so Carpenter obtained a voucher for them to obtain formula.

---

[1] The mother's sister and her infant child were part of the deprivation investigation and proceedings but are not a part of this appeal.

[2] Although Carpenter also testified that the home was cluttered and messy at times, the juvenile court did not rely on this testimony in its order.

The mother admitted that she had used whole milk, and Carpenter instructed her not to do so. Thereafter, Carpenter saw the family provide formula for the child. Carpenter was "not necessarily" (or, perhaps, not specifically) concerned about the mother's ability to feed the child at this time. Rather, she wanted to make sure the mother knew the basic elements of caring for an infant. In fact, Carpenter never personally observed the mother feeding the child. On one occasion she saw a green drink in a child's bottle, but she did not see either child drink it.

During the summer of 2007, Carpenter attempted to place parenting support services with the family, but she was unsuccessful because she could not find a willing service provider as a result of the mother's alleged disabilities. In August, however, she secured the services of the Marcus Institute, which instructs families on parenting skills, including what to feed infants, as well as general information on how to care for infants. Ms. Christian Izo was the assigned parenting specialist. Izo planned to perform an assessment of the family in the first two meetings followed by five separate training sessions on specific topics and retraining when necessary. If the parents were having difficulty, Izo could "extend it to as many sessions as they need."

Izo went to the home only twice. The first meeting, which lasted 20 to 30 minutes, amounted to an introduction and overview of the upcoming sessions. Izo's second visit, on September 25, lasted an hour and twenty minutes. During that time Izo observed the mother interact with the child. Izo saw N. H. holding a bottle of Kool-Aid, and she told the mother and grandmother that Kool-Aid was inappropriate, yet both the mother and the grandmother attempted to give the child more thereafter. Later, at mealtime, the mother served infant cereal that had been prepared incorrectly. According to Izo, "It was mixed to a thick, thick paste; I would describe it like as big [sic] as toothpaste or maybe even a little thicker." When fed, the baby spit it out. When the mother tried to put it back in, the baby choked. The mother picked the baby up, appropriately hit him on the back a few times, cleared his airways, and tried to feed the child again, whereupon the baby started crying. Izo then instructed the mother on appropriate foods, including listing what foods were inappropriate and stressing that the child should be receiving only formula at his age. Within a minute of that instruction, the mother, who was eating a beef and pasta dish, "put a little piece of the pasta in the baby's mouth." Izo told the mother that pasta was solid food and inappropriate, and the mother removed the pasta from the child's mouth.

Over objection, Izo explained that the mother's behavior raised

concerns:

> [W]hen I gave specific examples she wasn't able to general-
> ize those to other things; like if I gave examples of solid
> foods, bread, eggs, . . . thick cereal, she wasn't able to
> understand those examples of solid food, and then general-
> ize it to pasta is also a solid food. We discussed the baby not
> being allowed to have any water[,] [t]hat children of that
> age [are] not allowed water[;] and she didn't understand
> that Kool-Aid, which is made with water, is not an accept-
> able drink for an infant.

The mother was also unresponsive to the child's cues:

> Overall she had good interaction skills . . . but she didn't
> realize when the baby didn't want to be held . . . [or] when
> the baby didn't want to be played with. She didn't under-
> stand . . . that the baby did not want to eat enough [sic]
> food.

Moreover, the baby vomited five times in the hour and twenty minutes that Izo was there, "and the mom did not understand that that was a medical problem." The mother, however, had informed Izo that the child had been at the hospital three days earlier with gastrointestinal problems. Finally, based on her observations, Izo suspected that the mother and grandmother would continue to feed the child inappropriate foods after she left. She reported the incident to DFACS. Although Izo would normally have followed up with at least five weekly training sessions, she did not return.

Instead, within a day, Carpenter received the report, the child was removed from the home, and Carpenter began an investigation of the incident. Her investigation was comprised of speaking with Izo and the mother and providing the mother with a safety plan. She did not have the child evaluated. Nor did she attempt to obtain medical records from the hospital regarding the reported trip to the emer-gency room. When she questioned the mother, the mother denied giving the baby Kool-Aid. Carpenter also gave the mother a safety plan describing what foods were appropriate for the infant, but at that time, DFACS had no plans to return the child home with the safety plan in place. In fact, Carpenter never observed the mother and child together after that even though she acknowledged it would have been helpful to do so. As part of her explanation, Carpenter testified, "my job description does not include retraining parents." Rather, Carpenter closed her investigation because, she concluded, Izo's information about inappropriate feedings had been substanti-ated. On November 2, DFACS filed a petition alleging deprivation.

At the deprivation hearing, Carpenter opined that the mother still needed four hours of parenting support services every day and that it would be contrary to the child's welfare to be returned to the home without them. Carpenter contacted two potential providers before the children were removed from the home, but neither could provide services for four hours a day. She admitted, however, that "there probably are service providers that can provide four hours per day," although she then seemed to contradict herself. Ultimately she explained that the underlying issue was insurance coverage for such services. Izo, on the other hand, recommended that in order to reinforce appropriate training, the mother needed four hours of parental services only several days a week and that it could be provided by a parent aid or a neighbor of average intelligence. Izo would perform follow-up assessments thereafter. Finally, as of the adjudicatory hearing — December 10, 2007 — the mother had not been evaluated by a psychologist.

The court took that matter under advisement and reconvened on December 17; it then announced a finding of deprivation and elected to proceed with a dispositional hearing. The only evidence presented concerned a pending criminal charge against the mother. Carpenter testified that the mother had informed her that she had been charged with first degree cruelty to children regarding a different child. The mother testified that while she was babysitting a different child, she had a conflict with the child that caused her own mother to call the police; no other information about this incident was introduced. The court then postponed a decision on disposition pending completion of a parenting assessment and a psychological examination of the mother.

A report entitled "Psychological & Fitness For Parenting Evaluation" dated December 20, 1997 is included in the record. It obviously was not considered as a part of the finding of deprivation, and the court did not mention it in its dispositional order. It concludes that the mother's cognitive abilities are extremely low and that her ability to exercise judgment, make sound parenting decisions, and raise children is impaired as a result. On the same day, the court appointed a guardian ad litem for the mother.

The juvenile court issued its final order on January 15, 2008. In the order, the court found as a matter of fact that DFACS had put parenting services in the home in April 2007 to assist the mother with her newborn baby; that the mother fed the baby solid foods and other inappropriate food despite instruction that doing so was inappropriate; that a parenting specialist observed this behavior; that the mother and N. H. lived in a home with the mother's brother and sister, her sister's child, and her own mother; that the father's identity and whereabouts were unknown; that the father had not

legitimated or provided any support; that the child needed a legal guardian to provide for his everyday needs and supervision; and that DFACS had provided reasonable efforts to prevent removal of the child from the home.

The court concluded as a matter of law that the child was deprived as a result of the mother's mental impairment and other factors:

> [T]he mother has intellectual limitations evidenced by her continued improper feeding of the child. The child's father is unknown; his whereabouts are unknown. The unknown father has failed to legitimate the child or provide financial support on the child's behalf. The child is in need of a legal guardian to provide care for his everyday needs and supervision.

The court found that it was in the child's best interest to return him to his mother under a protective order but only after appropriate in-home services could begin. The court further ordered that the mother submit to psychological and parenting assessments and follow the ensuing recommendations, that the mother continue to cooperate with DFACS, and that she feed the child only age-appropriate foods.

We hold that although Izo only observed the mother's inappropriate attempts to feed the child on one occasion, the evidence was sufficient. The evidence showed that the mother appeared unable to grasp Izo's instructions regarding what the child should be fed to such a degree that the child's well-being was being affected. The child was choking on improper food and the mother continued to feed the child improper food immediately after being told not to. The mother did not recognize that repeated vomiting was a health issue despite the fact that she said the child had recently been to the emergency room for gastrointestinal problems. Izo opined that based on her observations, the mother and grandmother would continue to feed the child inappropriate foods. Under these circumstances, the child was clearly at risk. The idea that the mother might benefit from the recommended training does not impact on the question of whether the child was deprived as of the date of the hearing. The court took this factor into consideration for disposition and ordered that the child be returned to the home with appropriate in-home services in place.

2. The mother also contends the juvenile court erred by concluding that DFACS had provided parenting instruction to assist her with the child. She points to the fact that Izo never completed the anticipated training. We find this enumeration to be immaterial.

Izo's personal observation of the child receiving inappropriate food and of the mother failing to respond to instruction about how to properly feed the child was sufficient to support the decision.

3. The mother contends the juvenile court erred by concluding that she had intellectual limitations. Among other things, the court's order states, "the mother has intellectual limitations evidenced by her continued improper feeding of the child." The mother argues that there was no evidence of a "medically verifiable mental deficiency that renders the mother unable to provide for the needs of her child." See *In the Interest of D. N. K.*, 282 Ga. App. 430, 434 (1) (638 SE2d 861) (2006). But the juvenile court's decision regarding deprivation does not depend upon a finding of parental fault:

> The definition of a deprived child, as contained in OCGA § 15-11-2 (8), "focuses upon the needs of the child regardless of parental fault . . . . The petition is brought on behalf of the child and it is (the child's) welfare and not who is responsible for the conditions which amount to deprivation that is the issue." *Brown v. Fulton County Family &c. Svcs.*, 136 Ga. App. 308, 310 (2) (220 SE2d 790) (1975).

(Footnote and emphasis omitted.) *In the Interest of J. P.*, 267 Ga. 492 (480 SE2d 8) (1997).

*Judgment affirmed. Smith, P. J., and Mikell, J., concur.*

DECIDED FEBRUARY 23, 2009.

*Phyllis R. Williams*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Virginia B. Fuller, Assistant Attorney General*, for appellee.