**FIRST DIVISION**
**BARNES, P. J.,**
**COOMER and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 19, 2020**

# In the Court of Appeals of Georgia

A20A1417. IN THE INTEREST OF T. Y. et al., children.                CO-062

COOMER, Judge.

This case returns to us from remand. In the first instance, this Court vacated the juvenile court's denial of a motion for immediate reunification and return of the mother's six children to her custody. See *Interest of T. Y.*, 350 Ga. App. 553, 553, (829 SE2d 808) (2019). The mother appeals from the juvenile court's order on remand again denying her motion for reunification and argues that the juvenile court erred by finding (1) continued dependency, (2) that the continued dependency would cause serious harm, and (3) that the evidence to support such findings was clear and convincing. The mother also asserts that the juvenile court's findings were against weight of the evidence presented at the hearing and that the juvenile court erred by

modifying her visitation without applying the correct legal standard. For the reasons expressed below, we reverse.

> On appeal from an order finding [children] to be [dependent children], we review the juvenile court's finding of dependency in the light most favorable to the lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the [children are] dependent. In making this determination we neither weigh the evidence nor judge the credibility of the witnesses, but instead defer to the factual findings made by the juvenile court, bearing in mind that the juvenile court's primary responsibility is to consider and protect the welfare of [children] whose well-being is threatened.

*Interest of M. S.*, 352 Ga. App. 249, 256 (834 SE2d 343) (2019) (citation omitted). "[U]nder Georgia law, 'clear and convincing evidence' is an intermediate standard of proof which is greater than the preponderance of the evidence standard ordinarily employed in civil proceedings, but less than the reasonable doubt standard applicable in criminal proceedings." *In Interest of K. M.*, 344 Ga. App. 838, 847 (2) (811 SE2d 505) (2018) (citation and punctuation omitted). Viewed in the light most favorable to the juvenile court's order,[1] we recite the facts as stated in our prior opinion:

---

[1] See In Interest of R. D., 346 Ga. App. 257, 259 (1) (816 SE2d 132) (2018).

2

[T]he mother is the biological parent of six children, including T. Y., a son born in 2006; K. T., a daughter born in 2010; L. T., a son born in 2011; H. T., a daughter born in 2013; J. T., a daughter born in 2014; and A. T., a son born in 2017. Joseph Yeater—whose whereabouts are unknown—is the biological father of T. Y., and Lawrence Turner is the biological father of the remaining children. Turner is currently incarcerated, having pleaded guilty to charges of vehicular homicide.

DFCS's first involvement with the mother and her children occurred in May 2010, when the mother's second oldest child drowned in the bathtub. At that time, DFCS imposed a safety plan, which was ultimately closed. DFCS became involved again in 2014, when the mother called the police when she noticed bruising on T. Y. after Turner spanked the child. Turner was charged with cruelty to children, and DFCS implemented a safety plan requiring that he be separated from all the children.

On November 18, 2015, police officers found then eight-year-old T. Y., who has been diagnosed as autistic, wandering the streets alone after midnight. When questioned, he told authorities that he was going to Walmart to buy a new mother, provided his mother's name, and claimed that he had run away from home before. The mother was located later that day, but when investigators went to the home, they found it to be unsafe. Consequently, on November 23, 2015, DFCS filed a petition alleging that T. Y., five-year-old K. T., three-year-old L. T., two-year-old H. T., and one-year-old J. T. were all dependent. That same day, the juvenile court entered a preliminary protective hearing order,

nunc pro tunc to November 19, 2015, placing the children in the temporary custody of DFCS.

On December 16, 2015, the juvenile court—with the mother and Turner's consent—entered an order of adjudication and disposition finding the children to be dependent and, again, granting temporary custody of the children to DFCS. The juvenile court further noted the cruelty-to-children charge pending against Turner as a result of his unreasonable, excessive use of corporal punishment against T. Y. and that he had other pending criminal charges in Jeff Davis County, including homicide by vehicle in the first degree, driving under the influence of alcohol, and failure to maintain lane. Additionally, as part of this order, the juvenile court incorporated a reunification plan, which required Turner and the mother to establish and maintain an appropriate home and income for the children, undergo psychological evaluations and any treatment recommended as a result of such evaluations, complete a certified parenting class, and fully cooperate with DFCS.

On May 31, 2016, the mother and Turner filed a motion seeking to regain custody of the children on the ground that they had completed most of their reunification plan goals. But in a "Judicial Review Order" dated June 23, 2016, the juvenile court noted that then five-year-old K. T. alleged to her foster parent that Turner sexually abused her. An investigation was conducted, and although the allegations could not be substantiated at that time, K. T.'s foster parent continued to express concerns. Additionally, the advocacy center that investigated K. T.'s allegation of abuse recommended the child have no contact with Turner

4

and that a more thorough investigation be conducted. Nevertheless, on July 27, 2016, the mother and Turner filed another motion, this time requesting to reestablish visitation with K. T. and, alternatively, for a return of custody of all the children. On January 12, 2017, following a December 8, 2016 hearing, the juvenile court denied the mother and Turner's July 27, 2016 motion, finding that the mother had yet to seek counseling for her various mental-health issues and that Turner still had several criminal charges pending against him.

On April 13, 2017, the juvenile court entered a judicial review and permanency hearing order, finding that the mother had given birth to another child (A. T.) and had hidden her pregnancy from both DFCS and the court. In addition, the juvenile court's order found that the mother failed to comply with her reunification case plan and Turner had been sentenced to 15 years in prison with five years to serve after pleading guilty to the vehicular-homicide charges. On July 13, 2017, the juvenile court issued another order, finding that although the mother had made progress on her plan, she required further mental-health treatment.

On July 21, 2017, the mother filed a motion to return all the children to her custody, arguing that it was in the children's best interest to be reunified with their mother, and the DFCS caseworker and children's pediatrician concurred. The juvenile court held a multi-day hearing on the mother's motion on August 31, 2017; September 22, 2017; and September 28, 2017. And during that hearing, the DFCS caseworker testified that the mother had positive interactions with the children during visitations and was complying with her case plan, including

5

continuing to undergo counseling for her mental-health issues. She also testified that the mother's new home is clean and safe, but conceded that the home was in Turner's name, who was currently incarcerated. With regard to Turner, the caseworker admitted that she had concerns about him being around the children upon his release, in light of the allegations that he physically abused T. Y. and sexually abused K. T., but she did not believe the mother would risk losing her children by allowing Turner back into her life. She also acknowledged that the mother claimed she was uncertain as to whether Turner caused T. Y.'s bruises and that she had no intention of seeking a divorce. Additionally, the caseworker admitted that the mother lied to her about being pregnant with A. T. and, in fact, did not admit that A. T. was her child until nearly two months after his birth. Nevertheless, the caseworker recommended that all six children be returned to the mother's custody.

The juvenile court also considered testimony from a child psychologist charged with treating K. T. for post-traumatic stress disorder, who opined that the child's evaluations were consistent with that of a child who had been sexually abused. The psychologist further testified that she did not think K. T. should be returned to the mother's custody until it could be determined whether she was complicit in the child's sexual abuse.

In addition, a visitation supervisor with Horizon Family Services testified that the mother interacted well with the children and that her home was always clean. Consequently, she thought the children should be returned to the mother, but she also admitted that she was not aware

of the details of the reunification plan or whether the mother had fully complied with it. Similarly, two additional visitation supervisors, one with Horizon and the other with TLC Services, also testified that the mother interacted well with the children during visits and that the children wanted to return home.

Several of the children's current foster parents also testified. The foster parent for L. T. testified that the mother interacted well during visits, attended all of L. T.'s medical appointments, and, therefore, she believed L. T. should be returned to the mother's custody. The foster parent for T. Y. similarly testified and also advocated for reunification. The foster parent for K. T. testified that the girl currently denies that Turner sexually abused her, but she also acknowledged that K. T. told several counselors that such abuse had occurred, and she admitted that she was unsure if K. T. would be safe if returned to the mother's custody. Additionally, the foster parent for A. T. testified that the mother interacted well with the child and attended all of his medical appointments. But she, nonetheless, had concerns about returning A. T. to the mother's custody.

Three separate mental-health counselors testified as to their treatment of the mother. The first counselor stated that she was treating the mother for anxiety and depression and that she met one of her treatment goals and was making good progress toward the others. The counselor also stated that the mother had done well in her parenting classes, but, at this point, she was unable to provide an opinion as to whether the children should immediately be returned to her custody. The second counselor

7

testified that the mother complied with her recommendations regarding parenting education but that she needed to continue undergoing education for dealing with T. Y.'s autism and K. T.'s sexual-abuse allegations. The counselor believed that the mother could care for the children if she complied with these recommendations and also advocated for A. T.'s immediate return so that the young child could bond with the mother. The third counselor testified that the mother was compliant and on target for meeting her plan goals. But the counselor did express concerns that the mother did not agree K. T. had been sexually abused and that she wanted her entire family to be reunited, including Turner.

The mother testified at the hearing and claimed she was continuing with mental-health counseling but had otherwise completed her case plan, including obtaining a stable home and income. She admitted lying to DFCS about her pregnancy with A. T., claiming that she was worried she would lose custody of the child. She further testified that she was unsure as to the cause of T. Y.'s bruises, but noted that she was the one who involved the police after discovering them. The mother also stated that she was not sure Turner had sexually abused K. T. or physically abused T. Y., but she was open to that possibility. Additionally, she testified that she did not believe Turner was guilty of vehicular homicide even though he pleaded guilty to that offense and she had visited Turner in jail on several occasions. Nevertheless, she claimed that she did not intend to reunite with Turner upon his release because being reunited with her children was more important.

8

Finally, despite the DFCS caseworker's testimony recommending that the children be returned to the mother's custody, the caseworker's supervisor disagreed. Specifically, the DFCS supervisor agreed that the mother had been complying with her case plan with regard to counseling, but the supervisor insisted that she still had not seen a significant change in behavior. The supervisor testified that she was particularly concerned by the mother's refusal to believe Turner had sexually abused K. T., and that she continues to choose her husband over her children. For these reasons, the supervisor worried that the children will not be protected when Turner is eventually released from prison. The guardian ad litem agreed with this assessment, and, during the hearing, recommended that the juvenile court deny the mother's motion and increase visitation at a Court Appointed Special Advocates ("CASA") site.

At the conclusion of the hearing, the juvenile court took the matter under advisement. Then, on January 19, 2018, the court issued an order denying the mother's motion to have the children immediately returned to her custody.

*Interest of T. Y.*, 350 Ga. App. at 554-558.

The mother appealed and this Court vacated the trial court's ruling denying the mother's motion for immediate reunification and return of the children to her custody and remanded the case to the juvenile court with direction. *Interest of T. Y.*, 350 Ga. App. at 561-562. Specifically, we found that the juvenile court's order did not comply

9

with the statutory requirements of OCGA §§ 15-11-111 (b) (2) and 9-11-52 (a), leaving this Court without the means to make an intelligent or meaningful review of the mother's contentions. Id. at 561. On remand, the juvenile court entered a new order denying the mother's motion for return of custody which included its findings of facts and conclusions of law. In the order, the juvenile court concluded that the children continued to be dependent and that if the children are returned to the mother's custody, the mother would fail to protect the children from Turner upon his release from incarceration. In reaching its conclusion, the juvenile court noted the mother's ongoing mental health issues, her financial dependence on Turner, her dishonesty with respect to her pregnancy with A. T., and the likelihood that the mother and Turner would resume their relationship upon his release from incarceration. This appeal followed.

1. The mother asserts that the juvenile court erred in finding continued dependency because the three bases upon which the juvenile court found continued dependency, – that is, (1) the death of a child five years prior to the removal of the children from the home, (2) Turner's alleged abuse of T. Y., and (3) Turner's alleged sexual abuse of K. T., were insufficient to support such a finding. We disagree with the mother's assertions, but find cause for reversal of the juvenile court's order

10

because the order did not identify specific factual findings that authorized its conclusion that the children are presently dependent and that the cause of the children's dependency is likely to continue. See *In Interest of D. W.*, 340 Ga. App. 508, 512 (3) (798 SE2d 49) (2017).

"The Juvenile Code defines 'dependent child,' in relevant part, as a child who '[h]as been abused or neglected and is in need of the protection of the court.'" *In Interest of H. B.*, 346 Ga. App. 163, 164 (1) (816 SE2d 313) (2018). See also OCGA § 15-11-2 (22) (A). "Neglect," is defined as "[t]he failure to provide proper parental care or control, subsistence, education as required by law, or other care or control necessary for a child's physical, mental, or emotional health or morals." OCGA § 15-11-2 (48) (A). In determining whether a child is without proper parental care or control, courts shall consider "[e]gregious conduct or evidence of past egregious conduct of a physically, emotionally, or sexually cruel or abusive nature by such parent toward his or her child or toward another child of such parent; . . . [p]hysical, mental, or emotional neglect of his or her child or evidence of past physical, mental, or emotional neglect by the parent of such child or another child of such parent[.]" OCGA § 15-11-311 (a) (4)-(5). To make its determinations, the juvenile court may consider evidence of past misconduct because "the juvenile court is not required to

11

reunite a child with a parent in order to obtain current evidence of [dependency] or neglect." *In Interest of B. S.*, 265 Ga. App. 795, 797 (595 SE2d 607) (2004) (citation and punctuation omitted). "Nevertheless, the record must contain evidence of present dependency, not merely past or potential future dependency." *In Interest of H. B.*, 346 Ga. App. at 165 (1).

In its order on remand denying the mother's motion for immediate reunification, the juvenile court makes several findings of facts in support of its conclusion that the children remain dependent. The juvenile court noted that although Turner did not pose an immediate threat to the children, the mother's "subservient" relationship with Turner prior to and since his incarceration, her reluctance to believe the allegation of sexual abuse made by K. T. against Turner, her denial that Turner committed harmful acts against T. Y., her ongoing mental health issues, and her "repeated" dishonesty in her dealings with DFCS led the court to conclude that if the children were returned to the mother's custody, upon Turner's release from incarceration, the mother and Turner would once again live together, and by either her acts or omissions, the children would be subject to maltreatment.

Despite the juvenile court's reference to the children's past dependency and the possibility of future dependency should the mother and Turner reunite, the order does

not expressly state the cause of the children's present dependency. See *In Interest of A. J. H.*, 325 Ga. App. 848, 852 (755 SE2d 241) (2014) ("[T]he record must contain evidence of present deprivation, not past or potential future [dependency]." (citation and punctuation omitted)). Where the children have been removed from parental custody, current dependency may be proved by showing that, "if the children were returned to their mother at the time of the hearing, they would be [dependent].[2] This may be established by showing that the conditions upon which an earlier finding of [dependency] was based still exist at the time of [the hearing]." *In Interest of B. R. J.*, 344 Ga. App. 465, 473 (1) (a) (810 SE2d 630) (2018) (citation and punctuation

[2]    The Juvenile Code was substantially revised in 2013. Importantly, the former Juvenile Code authorized a juvenile court to award custody to the Department of any minor child shown to be "deprived." But the current Juvenile Code uses the word 'dependent' in lieu of "deprived.". . . Nonetheless, given the similarities between the definition of a "deprived child" and that of a "dependent child," we find that "our previous decisions addressing the deprivation of a child are relevant to appeals involving the dependency of a child.

*Interest of T. Y.*, 350 Ga. App. at 558 n. 3 (citations and punctuation omitted).

13

omitted). According to the juvenile court's own findings, the conditions upon which it had made the earlier finding of [dependency] had changed by the time of the hearing. The juvenile court made findings of fact that the mother was attending counseling and making progress with her mental health issues, was in compliance with several requirements of the case plan for reunification, attended the medical appointments for the children, had adequate and clean housing and income for the children, and interacted well with the children during her supervised visits. More importantly, Turner remained incarcerated at the time of the hearing with several years to serve on his 15 year prison sentence. "[A] finding of parental unfitness is essential to support an adjudication of present dependency." *In Interest of H. B.*, 346 Ga. App. at 165 (citation omitted). And this Court has defined "unfitness" on the part of a parent as "either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child." *In Interest of A. J. H.*, 325 Ga. App. at 852 (citation omitted).

In its findings of fact, the juvenile court noted that it had conducted all prior hearings in the case, and that despite the testimony of several witnesses recommending reunification, it was the court's belief, based on its observations, that the mother is "superficially a good mother." While it is not the duty of this Court to

14

weigh the evidence or determine the credibility of witnesses, when appellate standards are not met, we cannot affirm the juvenile court's decision. *In Interest of B. M. B.*, 241 Ga. App. 609, 609 (527 SE2d 250) (1999). Here, the crux of the juvenile court's reluctance to reunite the mother with the children is based on the potential of the mother reuniting with Turner upon his release from incarceration and the juvenile court's belief that the mother would fail to protect the children from him. However, these facts at best establish the potential for future dependency and do not establish by clear and convincing evidence present dependency. See *Interest of M. S.*, 352 Ga. App. at 261 (facts at most established potential future dependency, not present dependency where the parents with a history of domestic violence lived next door to each other, remained friends, and considered entering into a romantic relationship again in the future).

Considering the foregoing, we conclude that the record was insufficient to support the juvenile court's determination that at the time of the hearing, and by clear and convincing evidence, the children were presently dependent as a result of the mother's unfitness. See *Interest of K.*, 353 Ga. App. 855, 863 (840 SE2d 76) (2020) ("[T]he record before the deciding court must contain evidence of *present*

15

dependency, *not* merely past or potential future dependency." (emphasis in original)). Consequently, we reverse the juvenile court's finding of dependency.

2. As we find that there was insufficient evidence to support the juvenile court's finding of dependency, we need not reach the mother's remaining enumerations of error.[3]

*Judgment reversed. Barnes, P. J., and Pipkin, J., concur.*

---

[3] In her fifth enumeration of error, the mother alleged that the trial court erred by modifying her visitation without articulating the standard by which it applied to making the decision. However, because the order giving rise to this appeal did not address the mother's visitation, and the mother has not shown that the issue was raised in the juvenile court, the mother cannot raise this issue for the first time on appeal. See *In Interest of M. L. C.*, 249 Ga. App. 435, 436 (1) (548 SE2d 137) (2001).