600 S.E.2d 650 (2004)
267 Ga.App. 541
In the Interest of J.H. et al., children.
No. A04A0778.
Court of Appeals of Georgia.
May 21, 2004.
*651 Nelson & Smith, Carlton K. Nelson, III, Dublin, for appellant.
Thurbert E. Baker, Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Laura W. Hyman, Assistant Attorneys General, Lewis & King, LLC, Daniel M. King, Jr., for appellee.
ADAMS, Judge.
The mother of J.H. and P.H. appeals the termination of her parental rights. She contends that the state failed to present sufficient evidence to support the trial court's decision. We agree.
"On appeal, we view the evidence in the light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated." (Footnote omitted.) In the Interest of T.B., 249 Ga.App. 283, 286(1), 548 S.E.2d 45 (2001).
The testimony presented at the termination hearing shows that on March 6, 1999, Melissa H. married LaRue Todd. At the time, Melissa lived in Twiggs County and had two children from two previous relationships: J.H., an almost eight-year-old girl, and P.H., an almost five-year-old boy. Three months later, the children were placed in foster care due to allegations that Todd had sexually abused J.H. The record does not contain any allegations that the boy had been abused or that Melissa was implicated. Within a few weeks, Melissa filed for divorce.
Melissa testified that she did not know at the time that Todd was sexually abusing J.H. She had two jobs and was away from the house a lot. When J.H. told her what had happened, she confronted Todd but did not know what to believe. Todd never admitted the abuse to her, and she only came to believe that the allegations were true during one of J.H.'s therapy sessions about one year later.
After the children were removed from the home in June 1999, the Twiggs County Department of Family and Children Services instituted a case plan that prohibited Melissa from having any contact with Todd. At that time, Melissa apparently moved in with her mother in Macon. The couple was formally divorced in June 2000. After the divorce, Melissa and Todd worked at the same location and occasionally saw each other there, however, Melissa was dating someone else at *652 the time. Melissa's mother testified that she was aware that her daughter and Todd had contact in violation of the court order. Moreover, at the termination hearing, the juvenile court apparently took judicial notice that at an earlier hearing it made a finding of fact that there had been some continued contact.
In April 2001, Todd was convicted for his crimes, sentenced, and sent to prison where he remained at the time of the termination hearing. Melissa last saw Todd on the day of his sentencing hearing. She had been instructed not to go to the hearing, so she sent a friend to observe. Todd recognized the friend, followed her to Melissa's location, and beat up Melissa. A sheriff had to remove Todd from the premises.
On May 9, 2001, Melissa was in court in Dublin for a nonreunification hearing. On that day, a nonreunification plan was put in place, and Melissa was ordered to have no contact with the children. The order is not in the record. Melissa testified that at the hearing her attorney told her that she could not contact her children "or know anything about them." She received no further explanation of the order. She understood the order to mean that she was not allowed to have any telephone calls or any other form of contact. Melissa's mother testified that Melissa was suicidal for some time thereafter. That was the last time Melissa saw her children.
Neither Melissa nor any other family member has contacted the Department since that time or ever called to check on J.H.'s care. On cross-examination, Melissa admitted that she had not made any calls to the Department in two years. She claimed that it would have been fruitless because of the no contact order. She claimed to have called her attorney four times in the interim but that her calls were not returned. She does not recall a motion for reunification being filed on her behalf. She claimed that at some point she was told that her attorney had moved. Finally, she never gave her multiple changes of address to the court or her attorney.
At the beginning of 2002, Melissa moved to Florida, and took a job with a tree service for about seven or eight months. She had resided at the same address in Lakeland, Florida, for over one year prior to the termination hearing, in a two-bedroom trailer. She eventually quit her job to respond to a subpoena in Georgia and to be able to travel back and forth to Georgia every month. Her mother comes to get her from Macon because Melissa has an unreliable car.
Sharon Woods, the Department caseworker and its only witness, testified that she did not know where Melissa had been living for about 18 months: from the time of the May 2001 case plan until the time of the termination hearing (when she was able to locate Melissa with assistance from Melissa's mother). Melissa's mother confirmed that at times it had been difficult to keep track of Melissa, and that at one point, she was unsure of her whereabouts for about one year. Consequently, the Department had not requested or performed a home evaluation of Melissa's Florida residence.
Caseworker Woods did not know whether Melissa had ever been ordered to pay child support. Melissa admitted that she never paid any and added, "If my kids need money, then, fine, I will give it to them but in a bank account for just them. I'm not going to hand over money to somebody that can spend it on themselves."
J.H., who is now almost 13 years old, has had behavioral problems ever since the sexual abuse and is still under psychological care. According to the transcript, she has been diagnosed with "ADA ADHD," but no explanation of that condition was given. Melissa participated in J.H.'s therapy sessions in Columbus in 2001. J.H. lives in therapeutic foster care, but due to her behavioral problems she has been placed 23 times since she came into the Department's care. The caseworker testified that J.H. was finally in a stable placement. P.H. is in separate foster care. The caseworker testified that both children were doing well at the time of the termination hearing.
At the time of the termination hearing, Melissa was living in Florida with a fiancé. Melissa testified that she was in the process of moving to a three-bedroom trailer within *653 the month but she had no specific marriage plans. Although unemployed, she testified that she could support, feed, clothe, and provide a home for the children. She testified that she would be willing to go to any kind of therapy or counseling required. But she also admitted that she had not completed earlier court-ordered counseling. She stated that the doctor "cussed [her] out" and so she quit. She testified that she sought other counseling, which she attended twice a week, but no supporting evidence was submitted.
The trial court terminated Melissa's parental rights, and she appeals.
Before terminating a parent's rights, a juvenile court must employ a two-step test:
First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.
(Footnote omitted.) In the Interest of T.B., 249 Ga.App. at 285-286(1), 548 S.E.2d 45.
The trial court found that the children were deprived at the time they first came into the Department's custody, and Melissa never appealed that determination. "Therefore, [Melissa] is bound by this finding of deprivation and the first factor is satisfied." (Citations and punctuation omitted.) In the Interest of M.E.C., 228 Ga.App. 9, 10(1)(a), 491 S.E.2d 107 (1997).
In determining whether lack of proper parental care or control caused the deprivation, among other things, the court must consider past or present evidence of mental or emotional neglect of the child or of another child by the parent. OCGA § 15-11-94(b)(4)(B)(v). The court was also required to determine whether Melissa failed without justifiable cause for a period of one year or more prior to the filing of the petition for termination to develop and maintain a parental bond, to provide for the care and support of the children, and to comply with the court ordered reunification plan. See OCGA § 15-11-94(b)(4)(C)(i)-(iii). Finally, a parent "has a statutory duty to support her children, with or without a court order." (Citation omitted.) In the Interest of R.W., 248 Ga.App. 522, 526(2), 546 S.E.2d 882 (2001).
Construed in favor of the trial court's decision, there was sufficient evidence to find that a lack of proper parental care or control caused the children's deprivation. First, Melissa did not protect J.H. from Todd after the first incident in that she continued to have some contact with Todd after an order prohibiting her from doing so, and she was slow to recognize the threat to the child. Her failure to stay away from Todd constituted a violation of the reunification plan. Melissa also did not provide any support for the children while they were in the Department's care. Finally, Melissa failed to maintain any contact whatsoever with the court, her attorney, or the Department for a period of 18 months. And the court was authorized to find that Melissa's explanations for her failure to keep in contact and her failure to provide support lacked credibility or were mere excuses. She never questioned the order prohibiting contact with the children and never sought to have it overturned.
The third criteria requires proof that the cause of the deprivation is likely to continue. "[E]vidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of present unfitness is required." (Citations and punctuation omitted; emphasis in original.) In the Interest of K.M., 240 Ga.App. 677, 680, 523 S.E.2d 640 (1999). "But the trial court is entitled to consider evidence of the mother's past actions in determining whether the deprivation is likely to continue. It is not bound by mere promises to do better in the future." (Citations omitted.) In the Interest of A.M., 259 Ga.App. 537, 542, 578 S.E.2d 226 (2003).
We find the evidence of present unfitness to be problematic. Although Melissa has not take any steps to stay in contact with the children, she was ordered not to have contact with them. Furthermore, there is no evidence *654 that the children were deprived while in their mother's care prior to her marriage to Todd, and Todd, the primary cause of the original deprivation, is no longer in contact with Melissa or the children. See, e.g., In the Interest of V.E.H., 262 Ga.App. 192, 197(2), 585 S.E.2d 154 (2003) (physical precedent only). Indeed, Melissa now lives in Florida, where she would like to take the children. But, Melissa's attitude about paying child support is irresponsible, and her failure to pay breaches her legal duty to do so. The fact that Melissa is living with her fiancé raises questions but no home study has been performed. Cf. In the Interest of K.J., 226 Ga.App. 303, 305(1), 486 S.E.2d 899 (1997) (that mother lived with fiancé and had not set a date for marriage was not determinative). The daughter is clearly troubled but the Department did not present evidence that her condition was caused by Melissa.
Moreover, the record contains insufficient evidence to support the finding that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. There is very little testimony to support this finding with regard to J.H. and none with regard to P.H. See, e.g., In the Interest of J.M., 251 Ga.App. 380, 383(4), 554 S.E.2d 533 (2001) (no testimony that the children would be seriously affected by the mother continuing to have a parental relationship with the child); In the Interest of K.J., 226 Ga.App. at 309(2)(b), 486 S.E.2d 899 (neither caseworker testified that the children were likely to suffer serious harm if parental rights were not terminated, nor was there expert testimony on point). Essentially the only evidence presented was the suggestion that the fact that Melissa was living with a fiancé would harm the child. Accordingly, clear and convincing evidence was not shown to support a finding that the children were likely to suffer serious physical, mental, moral, or emotional harm as a result of a continued relationship with their mother.
Judgment reversed.
RUFFIN, P.J., and ELDRIDGE, J., concur.