646 S.E.2d 756 (2007)
In the Interest of A.S., et al., children.
No. A07A0527.
Court of Appeals of Georgia.
May 25, 2007.
*757 Blanton C. Lingold, San Jose, CA, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Kelli C. Rutherford, for appellee.
ADAMS, Judge.
The mother of A.S. and S.A. appeals from the trial court's order finding the children to be deprived under OCGA § 15-11-2(8)(A), and placing them in the temporary custody of the Jones County Department of Family and Children Services. The trial court found that the causes of the deprivation were neglect/lack of supervision, and that the mother failed to protect A.S. The mother contends, however, that a finding of deprivation was inappropriate because the evidence showed that she had an adequate home and had completed the requisite steps of her case plan prior to the deprivation hearing. For the reasons set forth below, we affirm the trial court's finding of deprivation.
"On appeal from a juvenile court's order finding deprivation, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the [child was] deprived. We neither weigh evidence nor determine the credibility of witnesses."
(Punctuation and footnotes omitted.) In the Interest of G.G., 253 Ga.App. 565, 560 S.E.2d 69 (2002). Here, the evidence showed that the Department first became involved with the family in or around November 2004, after an incident of sexual abuse involving A.S., who was then nine years old. A man exposed himself to A.S. and asked her to perform oral sex in exchange for five dollars; she ran away. After the mother became aware of that incident, she reported it to authorities. The Department determined at that time that the mother was not providing adequate food, clothing and shelter to either A.S. or her son, S.A. In addition, the mother had a male babysitter to watch the children while she worked overnight, and the Department required that she sign a safety plan that included a requirement that A.S. would not be left unsupervised around adult males.
In the current case, the Department was notified on or about July 5, 2006 that 12-year-old A.S. was pregnant after the mother took her daughter to a hospital for treatment. A.S. told authorities that she had at least four sexual partners since she was nine years old, including the mother's thirty-eight-year-old former boyfriend and a family friend in his twenties, as well as two juvenile partners. A.S. indicated that the 38-year-old ex-boyfriend was the baby's father.
After signing the initial safety plan, the mother had arranged for her own mother to babysit the children when she was not there. But on one occasion, her daughter returned early from a visit with her father, while the mother was at work and no one else was home. By telephone, the mother told her daughter to go to the 38-year-old ex-boyfriend's house. The first incident of sexual abuse involving the ex-boyfriend occurred at this time. A.S. later told a forensic interviewer that the ex-boyfriend had sexually abused her on three different occasions. During one of these incidents, S.A. was present at the ex-boyfriend's residence, but A.S. did not believe that he was aware of the abuse.[1] In another incident, an adult neighbor and family friend showed A.S. pornography and sexually abused her. These incidents occurred while the mother was home sleeping during the day and A.S. went to the men's residences. In addition, A.S. stated that when she was nine, she had sex with a sixteen or seventeen-year-old, and she later had consensual sex three or four times with another twelve-year-old. The mother fully cooperated with the authorities in their investigation, and told them that she had been unaware of these incidents.
*758 A.S. was removed from the mother's care because she was pregnant, and there were indications of neglect and lack of supervision. S.A. was removed due to evidence of neglect. For example, his teeth were in such bad shape that others teased him; the cavities were so large that they could be observed as he talked.
The Department prepared a case plan for the mother, which required her to demonstrate an ability to supervise her children; to keep them safe from sexual contact; and to complete parenting classes. The Department was to provide a parent aide. The case plan also required that the mother undergo a psychological evaluation and comply with any recommendations. The results of that evaluation revealed indications of depression and the psychologist recommended a psychiatric evaluation, which had not yet occurred. The mother completed her parenting classes and had independently obtained psychological counseling.
Moreover, the mother had moved from a trailer park to a house, which the Department found to be adequate. She made the move because she "didn't trust living around people I know anymore." She had been undergoing psychological counseling for a period of two months at the time of the hearing. The mother also changed her working schedule to a day shift from the night shift to allow her to be home when her children were home. And she had obtained dental and health insurance for the children. At the time of the deprivation hearing, the Department was planning to provide the mother with a parent aide within the next few weeks. At that point, the Department was asking that the mother cooperate with the parent aide and complete a psychiatric evaluation.
Despite the mother's actions to comply with the Department' requirements, the children's case manager, the contractor who performed the child and family assessment, the psychologist, and the court-appointed special advocate (CASA) all expressed concern that the mother did not accept any responsibility for what had happened to A.S. They were concerned that until the mother accepted responsibility for her role in the situation, she would be unable to recognize future potential hazards to her children's safety or to prevent further sexual abuse. At the hearing, the mother stated "Well, I'm not really guilty or nothing. I don't feel like I've done nothing wrong. . . . I do love my kids and I do want them, but I don't understand." Moreover, she did not believe A.S. when she said that she had been sexually active beginning at nine years old.
And the case manager, the contractor and the CASA who were present at the mother's visits with her children expressed concerns about her relationship with them. The case manager observed that there was "very minimal actual physical interaction" between the mother and A.S., without "a lot of loving, endearing communication between the two." The mother did not inquire about A.S.'s daily life or her school work. The contractor opined that the relationship between the two was more akin to friendship than to a parent-child relationship. When she observed their interaction, A.S. regressed to "almost infant like behaviors," and S.A. was not interested in interacting with his mother. The contractor did not believe that there was a "real close bond" between the two. During the visits the CASA observed, the mother never asked about A.S.'s pregnancy or health, but rather seemed more concerned about the court case. She did not observe a parent-child bond between the mother and the children. On the first visit, S.A. was very "standoffish" with his mother, and on the second, she ignored him as he cried and pleaded for her attention.
The contractor felt that the mother had inappropriate expectations of A.S., provided her too much freedom and failed to adequately supervise her. In addition, the contractor was concerned because it appeared that S.A. had been medically neglected, as evidenced by the condition of his teeth. The mother, on the other hand, felt that the Department had discriminated against her because she had children of different races. Moreover, she did not understand all the emphasis on supervision, stating: "The woman is always wanting to put these  these supervision problems. I mean these discipline problems in my face every time and I don't understand that. I'm not going to just run up to my child and correct her all the time, especially when she hasn't done nothing."
The psychologist found that A.S. had trust issues arising from her sexual abuse and *759 appeared to accept that sexual abuse from adult males was normal behavior, which could affect her future relationships with men. He found that S.A. was somewhat depressed and had anger issues. S.A.'s performance in school was significantly below his abilities to achieve, which the psychologist believed was the result of not having the proper structure or encouragement. Both the contractor and the CASA believed that parenting classes would not be enough for this mother, and that it would take time for her to learn to set the appropriate boundaries for her children and to obtain the proper parenting skills. The CASA observed that the mother's interactions with her children did not change after she completed the parenting classes.
Based upon these factors, both the contractor and the CASA recommended that the children remain in foster care for the present time. The psychologist recommended that both children be placed in a structured environment where proper boundaries are set for the children and where S.A. could receive academic help. Although the psychologist conceded that it might be possible for the mother to create an environment with the proper structure, he noted that it can sometimes be therapeutic to separate the parents and the children in order to begin to build that structure. The contractor and the CASA recommended that A.S. be sent to a group home for young mothers in order to learn parenting skills for her own child. Although both children expressed a desire to be home with their mother, A.S. was willing to comply with that recommendation. The children's guardian ad litem reiterated A.S.'s desire to be home with her mother, but noted that she was willing to try the group home. He recommended that S.A. not be returned to the mother.
We find that this record contains clear and convincing evidence to support the trial court's finding that the children were deprived. Under the pertinent provisions of OCGA § 15-11-2(8), a "deprived child" is a child who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." Here, the record demonstrates that the children were without the proper parental care and control necessary for their physical, mental or emotional health. A.S. was pregnant by a man to whom her mother had entrusted her, in violation of a prior safety plan. Other instances of abuse appeared to have occurred while the mother was home sleeping. S.A. showed signs of parental neglect as evidenced by his medical condition and educational status. The evidence showed that they had both suffered emotionally and psychologically from this neglect. And the mother failed to accept any responsibility for her children's condition or their lack of supervision.
We note that a deprivation petition "is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue." (Citation and punctuation omitted.) In the Interest of S.Y., 284 Ga. App. 218, 219, 644 S.E.2d 145 (2007). And a parent may lose temporary custody of a deprived child based upon a finding of parental unfitness that is either intentional or unintentional where it resulted in abuse or neglect of the child. Id.
We find no merit to the mother's argument that her compliance with the case plan and the other steps she has taken to improve her ability to care for her children demonstrate that the evidence in the record was insufficient to support the trial court's finding of deprivation. There was substantial testimony that these steps were not enough to provide the mother with the proper parenting skills or to enable her to properly supervise and care for her children. "It is the province of the juvenile court to weigh the evidence and determine its credibility." (Citation omitted.) In the Interest of L.F., 275 Ga. App. 247, 251, 620 S.E.2d 476 (2005). Thus, it was up to the trial court to determine what weight to give the mother's efforts to improve her parenting skills. Id.
Judgment affirmed.
ANDREWS, P.J., and ELLINGTON, J., concur.
NOTES
[1] A.S. said that she did not tell her mother about these incidents because her mother liked the man so much and she was afraid that the mother would blame her.