648 S.E.2d 771 (2007)
In the Interest of N.D. et al., children.
No. A07A0026.
Court of Appeals of Georgia.
July 3, 2007.
Jenkins & Olsen, Samuel Jacob Gowin, Chatsworth, for Appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Jason Samuel Naunas, Assistant Attorney General, for Appellee.
*772 MIKELL, Judge.
Appellant C.B., the biological mother of two girls, eleven-year-old N.D. and eight-year-old S.C., appeals the Juvenile Court of Murray County's provisional temporary placement order finding the children deprived. Appellant argues that the juvenile court's order must be reversed because its finding of deprivation was based on insufficient evidence and thus its decision to award custody to the Murray County Department of Family and Children Services ("DFCS") was erroneous. Appellant also challenges the trial court's decision to award temporary custody to DFCS of her two male children, nine-year-old A.C. and four-year-old H.C.[1] We affirm the juvenile court's order finding N.D. and S.C. deprived, but reverse to the extent that the order removes A.C. and A.H. from appellant's custody.
"On appeal from a juvenile court's order finding deprivation, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the children were deprived."[2] In doing so, we neither weigh the evidence nor determine the credibility of witnesses; instead, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met.[3] So viewed, the evidence adduced at the deprivation hearing on February 28, 2006, showed that Frank Matthews, a DFCS supervisor, filed a complaint on February 9, 2006, in which he alleged that DFCS received a referral from a school social worker informing them that N.D. had been sexually abused by appellant's fiancé; that N.D. later recanted; that N.D.'s sister, S.C., who was the putative daughter of appellant's fiancé, reported that she had been sexually abused by her grandfather, C.C., who was appellant's fiance's stepfather; that the fiance's adult sister, Sharon Parks, said that she had been abused by C.C. when she was a child; and that the caseworker was concerned about the girls' safety because appellant had not defended them but said they were lying.[4] On February 13, 2006, the court entered an immediate custody order placing N.D. and S.C. into the custody of DFCS.
At the deprivation hearing, Matthews testified that DFCS's relationship with this family began in January 2000, with an allegation by N.D. that she and her brother, A.C., were physically abused, which allegations were substantiated, but the case was closed; that four unsubstantiated referrals followed over the next five years, two of which involved alleged sexual abuse; and that in the incident which led to the filing of the petition, N.D. said that appellant's fiancé touched her private parts with his hands and with his private parts and made her put his penis in her mouth. Matthews further testified that appellant's fiancé denied touching N.D. and that appellant and S.B. told him that N.D. was a compulsive liar; that appellant's fiancé refused to take a lie detector test and had failed to undergo the psychosexual evaluation that DFCS asked him to attend. As a result of the incident, N.D. was placed with appellant's mother, S.B.
On cross-examination, Matthews acknowledged that N.D. made an allegation of sexual abuse against C.C. in February 2003, but it was unsubstantiated; that N.D. also made unsubstantiated allegations of physical abuse; and that N.D. recanted her allegation about appellant's fiancé to her homestead therapist, Wilma Carter, on August 29, 2005. When cross-examined by the attorney for the children, however, Matthews explained that unsubstantiated does not mean that an allegation is untrue, just that DFCS was unable to *773 follow up on the allegation and that he did not believe N.D. when she recanted.
Regarding S.C., Matthews testified that on February 7, 2006, he received a referral, informing him that S.C. had been sexually abused by C.C. Matthews recalled that when he asked appellant about S.C.'s statement, appellant said that the child "was known to fib." However, Matthews recalled that appellant's mother S.B. was present when he attended N.D.'s interview at the Greenhouse Facility and that S.B. indicated that she knew that C.C. had molested his stepdaughter, Parks. Matthews also concluded from that conversation that appellant was also aware that C.C. had molested Parks. In addition to the evidence of the alleged sexual abuse, Matthews also testified that he had received reports from S.C.'s school that she was having trouble and that her brother, A.C., who was suicidal, was not taking his medication because his Medicaid coverage lapsed. S.C. also told Matthews that her father picked up A.C. by the neck and pinned him against a wall because the boy could not find his shoes.
Amanda Osgatharp, a DFCS caseworker, testified that she investigated N.D.'s 2005 allegation against appellant's fiancé; that she first interviewed N.D. at school; that N.D. was very upset and told her that the touching began when appellant's fiancé told her to massage his feet and kicked her in her private area when she did not do it correctly; that N.D. also told her that appellant's fiancé would not let her put on underwear one night and touched her with his hands; and that he touched her vagina with his penis and made her put it in her mouth, which sometimes made her throw up. Osgatharp also testified that she interviewed appellant at her home on the same day that she initially interviewed N.D., and appellant said that N.D. lies all of the time. Appellant also informed Osgatharp that having her fiancé leave the house was not an option. When appellant attempted to talk to N.D. about the allegations in Osgatharp's presence despite Osgatharp's request that she not do so, Osgatharp concluded that it was necessary to remove N.D. from the home that day because she knew that appellant would badger N.D. about the allegation.
Paige Merit, the children's school counselor, testified that she was the person who contacted DFCS over the five-year period; that S.C. was watching a video about inappropriate touching with her class when she announced, "my granddaddy does that to me"; that S.C. told her that C.C. had touched her twice and that when S.C. told her grandmother, she was told to stay away from C.C.; that N.D. told her about the inappropriate touching by appellant's fiancé but later recanted; and that she did not report N.D.'s recantation to DFCS because she did not believe it.
Parks, the children's aunt and appellant's fiance's sister, testified that her adopted stepfather, C.C., sexually abused her from age four or five until she was fourteen or fifteen years old; that she told her mother about it, but her mother did not believe her; that her mother was still married to C.C.; and that she never told appellant about the abuse because when she saw appellant's children at her mother's house, they were in a different part of the house than C.C.
Appellant testified that she believed N.D. when she first accused C.C. of touching her inappropriately in 2003; however, she nonetheless allowed her children to stay with the grandparents after instructing the grandmother to keep the children with her. When asked why she let the children stay there, appellant responded that they only stayed there during the day and that C.C. stayed in the bedroom all the time. Appellant further testified that when she initially spoke with Matthews about S.C.'s allegations, she doubted S.C.'s credibility; that she still did not know if she believed the allegation that N.D. made against her fiancé; and that N.D. later told her that the allegation was untrue, but she lied because she wanted to go to S.B.'s house. Appellant still lived with her fiancé but maintained that she never left her girls alone with him because she was molested by her father when she was 11 years old. Appellant also testified that after the allegations were made, she still left her children with their paternal grandmother because she trusted her; that the grandmother had been *774 coming over to their house recently to keep her two boys so that they would not be exposed to C.C.; and that she would never allow her children to be exposed to C.C. again.
In its temporary placement order, the court found that the children were deprived and in need of the protection of the court, that DFCS attempted to work with the parents to no avail, and that allowing the children to remain in the home would be contrary to their welfare. The court granted DFCS custody of the children for a period not to exceed one year from the date of their initial placement with DFCS and ordered DFCS to assume custody of appellant's other children, A.C. and A.H. The court also directed that DFCS submit a written case plan to the court after meeting with the parents and that the evaluations and treatment prescribed in that plan be completed before the parents were reconsidered for a return of custody. DFCS prepared a reunification plan, which provided that C.C. have no contact with the children; that appellant's fiancé complete a psychosexual examination and follow any recommendations made; and that both parents attend and successfully complete a psychological evaluation, obtain and maintain a source of income, and maintain stable, clean, and safe housing to accommodate their family.
1. In her first two enumerated errors, appellant argues that the juvenile court's finding of deprivation was not supported by clear and convincing evidence, and consequently, the placement of the children with DFCS was erroneous. We disagree.
The definition of a deprived child focuses upon the needs of the child without regard to parental fault.[5] A deprived child is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."[6] Parental unfitness, whether intentional or unintentional, that results in abuse or neglect of the child may result in the parent losing temporary custody of a deprived child.[7] In this case, we conclude that the finding of deprivation and temporary loss of custody of N.D. and S.C. were supported by the evidence in the record.
Appellant testified that she believed N.D.'s 2003 allegation against C.C., but she continued to expose her children to him despite her knowledge that he had molested Parks. Although appellant herself was sexually abused as a child, she repeatedly told the DFCS personnel involved that her daughters were liars. She continued to live with her fiancé, and even at the time of the hearing, testified that she could not say that she believed N.D. Before the court was also evidence that several referrals had been made to DFCS pertaining to the children, including a substantiated claim of physical abuse against N.D. and A.C. Therefore, we find that there was clear and convincing evidence to support the juvenile court's finding that N.D. and S.C. were deprived and needed to be removed from appellant's custody.[8]
*775 2. Appellant argues that the juvenile court erred when it sua sponte removed A.C. and H.C. from her custody as a part of ruling on the deprivation petition filed on behalf of N.D. and S.C. We agree.
In its order, the juvenile court did not state the basis for its decision to remove A.C. and H.C. from appellant's custody. Although OCGA § 15-11-45(a)(4) permits a child to be taken into custody by an officer of the court "if there are reasonable grounds to believe that the child is suffering from illness or injury or is in immediate danger from his or her surroundings and that his or her removal is necessary[,]" we cannot find in the instant case that this statute authorized the removal of these children from appellant's custody. There was no petition for deprivation filed on behalf of A.C. and H.C., affording appellant an opportunity to respond thereto. Although the trial court noted in its order that the guardian ad litem attorney recommended that all of the children be found to be deprived and placed in the custody of DFCS, the court made no findings whatsoever as to H.C. and as to A.C., made limited findings.[9] Although DFCS is not precluded from filing a petition as to A.C. and A.H., we cannot condone the removal of the children from appellant's custody in conjunction with the grant of the deprivation petition filed as to N.D. and S.C. where the findings made as to A.C. and H.C. did not demand a parental loss of custody. "Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship."[10] Such proof has not been offered in the instant case.
The trial court's order is affirmed as to the girls, N.D. and S.C. As to the boys, A.C. and H.C., the trial court is reversed with direction. The boys are to stay in the custody of DFCS for 60 days after receipt of the remittitur, with leave for DFCS to file a petition for a provisional temporary placement order. The mother shall have notice and an opportunity to be heard. Unless the trial court orders again a temporary placement, with written findings of fact, the boys will be returned to their mother after the 60 days.
Judgment affirmed in part and reversed in part with direction.
JOHNSON, P.J., and PHIPPS, J., concur.
NOTES
[1] These were the children's ages at the time of the hearing. Their birth dates are not in the record.
[2] (Punctuation and footnote omitted.) In the Interest of G.G., 253 Ga.App. 565, 560 S.E.2d 69 (2002).
[3] In the Interest of B.M.B., 241 Ga.App. 609, 527 S.E.2d 250 (1999).
[4] N.D. was removed from appellant's home on April 20, 2005, and placed in the custody of her maternal grandmother, S.B.S.B., however, violated N.D.'s safety plan when she allowed her son, who tested positive for amphetamines, to stay in her house.
[5] In the Interest of J.W., 271 Ga.App. 518, 610 S.E.2d 144 (2005).
[6] OCGA § 15-11-2(8)(A); In the Interest of M.L.C., 249 Ga.App. 435, 436(2), 548 S.E.2d 137 (2001).
[7] (Citation omitted.) In the Interest of A.S. and S.A., 285 Ga.App. 563, 646 S.E.2d 756 (2007).
[8] See In the Interest of S.Y. et al., 284 Ga.App. 218, 644 S.E.2d 145 (2007) (juvenile court authorized to consider evidence that mother left children with relative she knew was unsuitable to supervise them as probative of mother's inability to protect her children); In the Interest of J.H., 267 Ga.App. 541, 544, 600 S.E.2d 650 (2004) (finding that mother failed to protect child from abuser after first incident contributed to conclusion that there was a lack of parental control that caused the child's deprivation). See also In the Interest of K.C.H., 257 Ga.App. 529, 531(2), 571 S.E.2d 515 (2002) (mother's choice to expose her child to a potentially dangerous predator who had sexually abused her older child constituted clear and convincing evidence that the children were deprived). Compare In the Interest of D.C., 259 Ga.App. 157, 576 S.E.2d 77 (2003) (trial court finding that there was no deprivation affirmed where there was no investigation of the allegations or suspicions of sexual abuse, and no witness testified to observing any inappropriate behavior by either potential abuser toward children).
[9] The trial court found that the mother admitted that A.C. suffered from depression and reported to school officials that he had attempted suicide; that A.C. had been accused of aggressive behavior at school; and that he was without medication once when appellant allowed their medicaid coverage to lapse though she understood his need for the medication.
[10] (Citation omitted.) In the Interest of A.J.I., 277 Ga.App. 226, 227, 626 S.E.2d 195 (2006).